# EXHIBIT 1

## Opinion & Order on Polymer80, Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction

**[Attached]**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| POLYMER80, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:23-cv-00029-O |
| MERRICK GARLAND, et al., | § § § | |
| Defendants. | § § | |

**OPINION & ORDER ON POLYMER80, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Before the Court are Plaintiff Polymer80, Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 14) and Brief in Support (ECF No. 15), filed March 7, 2023; Defendant's Response (ECF No. 20), filed March 9, 2023; and Plaintiff's unopposed Motion for Leave to File Reply in Excess of Page Limit and Reply (ECF No. 26), filed March 26, 2023. Because there is good cause and the motion is unopposed, the Court **GRANTS** Plaintiff's motion to file an overlength brief (ECF No. 26). Having considered the parties' briefing and applicable law, the Court **GRANTS** Plaintiff's motion for leave to file an overlength brief (ECF No. 26) and for a temporary restraining order and preliminary injunction (ECF No. 14). Because it is not a jurisdictional issue relating to this Court's power to adjudicate the instant motion, the Court **RESERVES** ruling on the issue of venue raised in Defendant's response and pending Motion to Dismiss Complaint for Improper Venue or, in the Alternative, to Transfer Venue (ECF No. 12), filed March 7, 2023.

## I. INTRODUCTION

### a. *Statutory & Regulatory Background*

The Gun Control Act of 1968 regulates firearms in interstate commerce. 18 U.S.C. § 921

("GCA" or "the Act"). Among other things, the Act requires manufacturers and dealers of firearms to have a federal firearms license. *Id.* § 923(a). Dealers must also conduct background checks before transferring firearms to someone without a license, and they must keep records of firearm transfers. *Id.* §§ 922(t), 923(g)(1)(A).

The Act defines the term "firearm" four different ways: "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." *Id.* § 921(a)(3). But "[s]uch term does not include an antique firearm." *Id.* Congress delegated authority to administer and enforce the Act to the Attorney General. *Id.* § 926(a). The Attorney General, in turn, delegated that authority to the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 C.F.R. § 0.130(a).

In 1968, ATF promulgated a rule interpreting the phrase "frame or receiver." The rule defined the "frame or receiver" of a firearm as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Commerce in Firearms and Ammunition, 33 Fed. Reg. 18,555, 18,558 (Dec. 14, 1968) (codified at 26 C.F.R. § 178.11). In the decades since, ATF's definition of "frame or receiver" remained in place until the recent promulgation of the Final Rule. And the agency has not made any indication that it was changing course with respect to its

interpretation of the Act.[1] Indeed, on three occasions in the last eight years, ATF confirmed that Polymer80's products are not "firearms" for purposes of the GCA.[2]

However, in April 2022, ATF published a Final Rule changing, among other things, the 1968 definition of "frame or receiver." *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24,652 (Apr. 26, 2022) (codified at 27 C.F.R. pts. 447, 478, and 479). The Rule took effect on August 24, 2022. ATF split the phrase into two parts, assigning the term "frame" to handguns and the term "receiver" to any firearm other than a handgun, such as rifles and shotguns. *See* 27 C.F.R. § 478.12(a)(1), (a)(2). ATF then defined the terms "frame" and "receiver" along the same lines as the 1978 rule, though with updated, more precise technical terminology.[3] But ATF did not stop there.

Rather than merely updating the terminology, ATF decided to regulate *partial* frames and receivers. Under the new Final Rule, "[t]he terms 'frame' and 'receiver' shall include a partially

---

[1] *See, e.g.*, Gov't's Mot. to Dismiss, *California v. ATF*, No. 3:20-cv-06761, 2020 WL 9849685 (N.D. Cal. Nov. 30, 2020) ("Congress has chosen to exclude firearm parts from the scope of the GCA, including parts that could be assembled with a homemade receiver and frame to make a firearm.").

[2] Pl.'s Br. 6–7, ECF No. 15; Pl.'s App. 140–56, ECF No. 16, Classification Letter, Bureau of Alcohol, Tobacco, Firearms & Explosives (Jan. 18, 2017) (determining Polymer80's PF940C pistol blank frame is not a firearm); Pl.'s App. 130–148, ECF No. 16, Classification Letter, Bureau of Alcohol, Tobacco, Firearms & Explosives (Nov. 2, 2015) (determining Polymer80's Glock-type GC9 pistol frame blank and Warrhogg receiver blank are not firearms); and Pl.'s App. 158–59, ECF No. 16, Classification Letter, Bureau of Alcohol, Tobacco, Firearms & Explosives (Feb. 3, 2015) (determining Polymer80's AR-15 pattern receiver blank is not a firearm).

[3] The two terms are defined as follows:

> (1) The term "frame" means the part of a handgun, or variants thereof, that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence, even if pins or other attachments are required to connect such component (i.e., sear or equivalent) to the housing or structure.
>
> (2) The term "receiver" means the part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

27 C.F.R. § 478.12(a).

3

complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* § 478.12(c). But "[t]he terms shall not include a forging, casting, printing, extrusion, unmachined body, or similar article that has not yet reached a stage of manufacture where it is clearly identifiable as an unfinished component part of a weapon (e.g., unformed block of metal, liquid polymer, or other raw material)." *Id.* When determining whether an object is a frame or receiver, the ATF Director is not limited to looking only at the object. "When issuing a classification, the Director may consider any associated templates, jigs, molds, equipment, tools, instructions, guides, or marketing materials that are sold, distributed, or possessed with the item or kit . . . ." *Id.* To determine whether an object may "readily" be converted into a firearm, ATF may consider relevant factors such as (1) time, (2) ease, (3) expertise, (4) equipment, (5) parts availability, (6) expense, (7) scope, and (8) feasibility. *Id.* § 478.11. The Final Rule also amends ATF's definition of "firearm" to include weapon parts kits. The ATF's new definition of "firearm" "shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." *Id.*

In the months since the Final Rule was published, on December 27, 2022, ATF issued informal guidance to industry members, identifying specific manufacturers of frame and receiver blanks and particular products that ATF considered subject to the Final Rule ("Open Letter").[4] The same day, and without having received a classification request, ATF sent a letter to Polymer80 identifying several of the company's products as "firearms" for purposes of the GCA

---

[4] Pl.'s App. 108–17, ECF No. 16, Open Letter to All Firearm Licensees 1, Bureau of Alcohol, Tobacco, Firearms & Explosives (Dec. 27, 2022) (identifying "partially complete Polymer80 . . . striker-fired semiautomatic pistol frames, including, but not limited to, those sold within parts kits" as "frames" and, therefore, "firearms" for purposes of the GCA).

4

and the Final Rule, even when those items are sold separately and not in a kit ("Polymer80 Letter").[5] Less than two weeks later, Polymer80 filed this lawsuit and sought to intervene in a related lawsuit.[6]

### b. Procedural Background

The Court is currently addressing challenges to ATF's Final Rule in *Vanderstok v. Garland*, No. 4:22-CV-00691-O (N.D. Tex. filed Aug. 11, 2022). Though the *Vanderstok* plaintiffs did not raise all of the same claims as Polymer80, they raised some identical claims, including that the Final Rule exceeds the lawful scope of ATF's statutory authority under the GCA.[7] That case was filed in early August, after the Final Rule was announced on April 26, 2022 and before it took effect on August 24, 2022. Within a week of filing suit, the *Vanderstok* plaintiffs moved for a nationwide injunction.[8] The Court denied that request for relief on September 2, 2022.[9]

In the weeks and months following that September decision, Polymer80 "attempted in good faith to comply with the Final Rule."[10] But after receiving the Open Letter and Polymer80 Letter from ATF in December 2022 and learning it would be "forced . . . to discontinue sales of unfinished-frame kits *and* unfinished frames as they are currently designed," Polymer80 sought to intervene in the *Vanderstok* litigation as other successful intervenors had.[11] Simultaneously,

---

[5] Pl.'s App. 119–28, Letter to Polymer80, Bureau of Alcohol, Tobacco, Firearms & Explosives (Dec. 27, 2022); Kelly Decl. ¶ 12, Pl.'s App. 4–5, ECF No. 16.
[6] Compl., ECF No. 1; Pl.'s Mot. to Intervene, *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Jan. 9, 2023).
[7] Compl., *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Aug. 11, 2022) (claiming the Final Rule was issued in excess of ATF's statutory jurisdiction and authority (Count I)); Pl.'s Compl. 31, ECF No. 1 (same).
[8] Mot. for Prelim. Inj., *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Aug. 18, 2022).
[9] Opinion & Order, *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Sept. 2, 2022).
[10] Kelley Decl. ¶ 14, Pl.'s App. 5, ECF No. 16.
[11] Kelley Decl. ¶ 15, Pl.'s App. 6, ECF No. 16 (emphasis added); Pl.'s Reply 18, ECF No. 26-1; *see generally Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. filed Aug. 11, 2022).

5

Polymer80 filed its own lawsuit.[12] Six weeks later on March 7, 2023, Polymer80 filed the instant TRO and sought an expedited briefing schedule, which the Court granted.[13] Earlier that day, the Government filed a motion to dismiss or transfer based on improper venue and sought its own expedited briefing schedule.[14] On March 12, 2023, the Court denied the Government's motion to expedite on grounds that the motion to dismiss or transfer identified no emergency and did not challenge anything running to the merits of the case or ability to hear it, such as the Court's subject matter jurisdiction.[15]

    c. *The Parties*

Plaintiff Polymer80, Inc. is a commercial enterprise that "manufactures, markets, and distributes firearms, non-firearm products such as receiver blanks (partially complete, disassembled, or nonfunctional frames), and other innovative products, components and accessories," such as jigs, tools, and associated parts kits.[16] Polymer80's core business is selling these items, which are subject to the Final Rule.[17] For years, and based on ATF's representations that the company's products were not "firearms," Polymer80 structured "its business model," "invested capital," and lawfully sold receiver blanks directly to consumers throughout the country and in this district.[18] After Final Rule was promulgated, and in a good faith effort to comply with the Rule, Polymer80 stopped selling its receiver blanks with accompanying jigs.[19] However, ATF's Open Letter and Polymer80 Letter make clear that even selling blanks

---

[12] Compl., ECF No. 1.
[13] Pl.'s Mot., ECF No. 14; Pl.'s Mot. to Expedite, ECF No. 17; Order, ECF No. 18.
[14] Def.'s Mot. to Dismiss, ECF No. 12; Def.'s Mot. to Expedite, ECF No. 19.
[15] Order, ECF No. 22.
[16] Compl. 1–2, ECF No. 1.
[17] Kelley Decl. ¶ 5, Pl.'s App. 3, ECF No. 16.
[18] *Id.* ¶ 9.
[19] *Id.* ¶ 14.

6

separately is violative of the Final Rule.[20] The inability to sell receiver blanks or parts kits has "caused profound economic harm to Polymer80 and threaten[s] its very existence as a going concern."[21] Without immediate relief, Polymer80 estimates it "can survive as a corporate entity for perhaps as little as three weeks."[22]

Plaintiff has sued the Attorney General, Department of Justice, ATF, and the ATF Director over the Final Rule and its implementation of the regulation.[23] Plaintiff now asks the Court to enter a temporary restraining order ("TRO") and enjoin Defendants from enforcing or otherwise implementing (e.g., through informal guidance letters or otherwise) the Final Rule against Plaintiff.[24]

Plaintiff attacks ATF's Final Rule and subsequent guidance letters as unlawful in several respects: (1) that "ATF has exceeded its statutory authority by creating and implementing a new definition of 'firearm' [that] contradicts the plain language of the Gun Control Act" and that ATF's attempts to implement the regulation are arbitrary and capricious;[25] (2) that the Final Rule violates Polymer80's First Amendment rights because the regulation "is a content-based restriction on protected speech" that cannot pass strict scrutiny;[26] (3) that the Final Rule in conjunction with the ATF letters violate Polymer80's Second Amendment rights by regulating constitutionally protected conduct "in a way that is inconsistent with the Nation's historical tradition of firearm regulation" contrary to Supreme Court precedent;[27] and (4) that the Final Rule in conjunction with the ATF letters violate Polymer80's Fifth Amendment rights because

---

[20] *Id.*
[21] *Id.* ¶ 16.
[22] *Id.* (dated Mar. 7, 2023).
[23] Compl. 5–6, ECF No. 1.
[24] Pl.'s Mot. 1, ECF No. 14.
[25] Pl.'s Mot. 2, ECF No. 14; Pl.'s Br. 13, ECF No. 15.
[26] Pl.'s Br. 14, ECF No. 15.
[27] *Id.* at 16 (analyzing *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)).

(i) they "effectuate a regulatory taking without just compensation" and (ii) deny due process as impermissibly vague.[28] The parties have briefed the issues and the motion is ripe for review.

## II. LEGAL STANDARDS

The decision to grant or deny injunctive relief is committed to the district court's discretion. *See Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). To establish entitlement to a preliminary injunction, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in its favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "A [temporary restraining order] is simply a highly accelerated and temporary form of preliminary injunctive relief, which requires that the party seeking such relief establish the same four elements for obtaining a preliminary injunction." *Greer's Ranch Café v. Guzman*, 540 F.Supp.3d 638, 644–45 (N.D. Tex. 2021) (O'Connor, J.) (cleaned up).

Upon determining that a party is entitled to injunctive relief, a court must also decide the appropriate scope of that prospective injunction. "[T]he scope of injunctive relief is dictated by the extent of the violation established[.]" *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And because it is considered an extraordinary remedy, an injunction "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 756 (1994) (cleaned up). As movant, the party seeking relief bears the burden of proving all four elements of the preliminary injunction. *Nichols v. Alcatel*

---

[28] *Id.* at 18–21.

*USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008); *Miss. Power & Light Co.*, 760 F.2d at 621.

### III. ANALYSIS

#### A.

Because the Government claims improper venue, the Court will briefly address (but not resolve) the issue as a threshold matter. As noted above, the Government moved to dismiss this action based on improper venue and, after Plaintiff filed its TRO, moved to expedite the venue briefing. The Court denied the Government's motion to expedite. Order, ECF No. 22.[29] In its Order the Court noted that, unlike Plaintiff's demonstrated need for emergency relief, the Government "offered no equivalent existential reason why the Court should consider its venue motion on an expedited basis." *Id.* at 1.

Specifically, the Government claims improper venue based on the fact that Plaintiff cannot show that a "substantial" part of the events giving rise to its claim occurred in this district. 28 U.S.C. § 1391(e)(1). Because Plaintiff avers that it routinely transacts business in and attends sales events in the Northern District of Texas (i.e., it has some connection to this venue), the dispute is whether the events giving rise to the instant lawsuit that occurred within this district are substantial *enough*. As the Court previously held, that question requires further analysis that need not be rushed to the top of the Court's docket, ahead of the numerous cases (including several other requests for emergency relief) currently pending, given that it does not implicate the Court's *jurisdictional* authority. *Bywaters v. United States*, 196 F.R.D. 458, 464 (E.D. Tex. 2000) ("Venue does not relate to the power to adjudicate, but to the place where that power is to be exercised and 'is a concept oriented around the convenience of the litigants and the court system.'") (quoting *Jones v. United States*, 407 F. Supp. 873, 876 (N.D. Tex. 1976)).

---

[29] Rather than accept that decision, the Government apparently attempts an end-run around the Court's previous Order by incorporating its venue arguments in its response to the TRO. Def.'s Br. 8–11, ECF No. 25.

9

Moreover, the Government did not then—nor does it now—cite any binding authority dictating that this Court *must* resolve a non-subject matter jurisdictional venue motion before it addresses Plaintiff's motion for emergency relief. *Id.* at 1–3. The Court will address the Government's venue motion in due course. But for the reasons discussed, it will not expedite consideration of that issue and, accordingly, **RESERVES** ruling on the venue question in the interim.

**B.**

**1. Substantial Likelihood of Success on the Merits**

To show a substantial likelihood of success on the merits, Polymer80 need not show it is entitled to summary judgment on its claim, but must present a prima facie case. *Daniels Health Servs.*, 710 F.3d at 582. Polymer80 has met that burden with respect to at least one of its claims—that the Final Rule exceeds the scope of ATF's statutory authority—and has, therefore, satisfied "arguably the most important" of the four preliminary injunction factors. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

The Administrative Procedure Act ("APA") instructs courts to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Plaintiff contends that ATF's Final Rule, and its implementation of the regulation, exceeds the agency's statutory authority under the plain language of the GCA "because its redefinition of 'frame or receiver' and treatment of parts kits are inconsistent with the [Act's] plain language."[30] Plaintiff is correct.[31]

---

[30] Pl.'s Br. 13, ECF No. 15; Compl. 32–33, ECF No. 1.
[31] This Court has already determined that the Final Rule likely exceeds ATF's statutory authority and incorporates its prior reasoning here. Opinion & Order 6–16, *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Sept. 2, 2022).

10

a. **Parts that *may become* receivers are not receivers.**

The text of the Gun Control Act resolves this motion. When "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (citation omitted). The Court "begin[s] with the assumption that the words were meant to express their ordinary meaning." *United States v. Kaluza*, 780 F.3d 647, 659 (5th Cir. 2015) (citation and internal quotation marks omitted). But when a statute "includes an explicit definition," the Court "'must follow that definition,' even if it varies from a term's ordinary meaning." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776 (2018) (citation omitted). "Statutory language 'cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (citation omitted).

Congress carefully defined its terms in the Gun Control Act. The primary definition of "firearm" in the Act contains three parts: "any weapon (including a starter gun) which [1] will or [2] is designed to or [3] may readily be converted to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3)(A). Under this primary definition, a firearm is first and foremost a *weapon*. Underscoring that point, Congress explicitly named starter guns in the definition because starter guns are not obviously weapons. Then, because weapon parts also are not "weapons," Congress created a secondary definition covering specific weapon parts: "the frame or receiver of any such weapon." *Id.* § 921(a)(3)(B). Congress did not cover all weapon parts—only frames and receivers. And *only* the frames and receivers "of any such weapon" that Congress described in the primary definition.

11

Congress did not define the phrase "frame or receiver," so the words receive their ordinary meaning. *See Kaluza*, 780 F.3d at 659. In the Final Rule, ATF interprets the phrase as two separate parts. ATF says the "term 'frame' means the part of a handgun . . . that provides housing or a structure for the component (i.e., sear or equivalent) designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence." 27 C.F.R. § 478.12(a)(1). ATF defines "receiver" similarly, though it says the term refers to a "rifle, shotgun, or projectile weapon other than a handgun." *Id.* § 478.12(a)(2).

But the Final Rule did not merely update ATF's terminology. ATF added an entirely new section expanding its jurisdiction to include "partially complete, disassembled, or nonfunctional frame[s] or receiver[s]." *Id.* § 478.12(c). ATF now claims authority to regulate parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." *Id.* The parts must be "clearly identifiable as an unfinished component part of a weapon." *Id.* In deciding whether something is a partially complete frame or receiver, ATF may consider other materials such as molds, instructions, and marketing materials "that are sold, distributed, or possessed with the item or kit." *Id.*

The Final Rule's redefinition of "frame or receiver" conflicts with the statute's plain meaning. The definition of "firearm" in the Gun Control Act does not cover all firearm parts. It covers specifically "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). That which *may become* a receiver is not itself a receiver. Congress could have included firearm parts that "may readily be converted" to frames or receivers, as it did with "weapons" that "may readily be converted" to fire a projectile. But it omitted that language when talking about frames and receivers. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is

generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) (citation and internal quotation marks omitted). Likewise, when Congress uses a phrase in one part of a definition and excludes that phrase from another part of the very same definition, courts should give effect to Congress's deliberate exclusion.

Congress excluded other adjectives that ATF adds to its definition. The Final Rule covers "disassembled" and "nonfunctional" frames and receivers. 27 C.F.R. § 478.12(c). Congress's definition does not. Again, compare the language in Congress's primary definition of "firearm" to its secondary definition covering frames and receivers. The primary definition of "firearm" includes any "weapon" that "is designed to" fire a projectile. 18 U.S.C. § 921(a)(3)(A). That language covers disassembled, nonfunctional, and antique firearms because they are "designed" to fire projectiles even if they are practically unable to do so. But Congress wanted to exclude antiques, so it explicitly said the "term does not include an antique firearm," once again demonstrating awareness of the scope of the language it chose. *Id.* § 921(a)(3). In contrast, Congress did not choose to cover firearm parts that are "designed" to be frames or receivers—that is, incomplete, nonfunctional frames or receivers. "That omission is telling," particularly when Congress used that more expansive terminology in the same definition. *Collins*, 141 S. Ct. at 1782.

ATF's new definition of "frame or receiver" in 27 C.F.R. § 478.12(c) is facially unlawful. By comparison, the Final Rule includes definitions of "frame" and "receiver" in § 478.12(a) that appear to be consistent with the statute. This further highlights that the Final Rule's expansion of authority in § 478.12(c) to firearm parts that are *not yet* frames or receivers goes beyond Congress's definition. In other words, § 478.12(a) describes the full scope of frames

and receivers that are consistent with the statutory scheme. ATF's expansion in § 478.12(c), on the other hand, covers *additional* parts that are "designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). But Congress intentionally omitted that language from the definition. Section 478.12(c) is thus facially unlawful because it describes only parts that Congress intentionally excluded from its definition of "firearm." It is purely an expansion of authority beyond the statutory language. That the firearm part is "designed" to be or may one day become a frame or receiver does not change the fact that, in that moment, it is not "the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3)(B).

Defendants' counterarguments are unpersuasive. First, Defendants urge the Court to reject its own prior reasoning and adopt "the persuasive reasoning of other decisions denying preliminary relief to plaintiffs challenging the [Final] Rule."[32] Having reviewed those decisions, the Court is not persuaded by the fairly cursory statutory analysis of *Morehouse Enters v. ATF*, or by the decision in *Div. 80, LLC v. Garland*, which did not address the merits of plaintiff's claim.[33] In this Court's view, the *Morehouse* court's analysis does not reflect "the level of rigor that usually accompanies statutory interpretation," *In re Harris*, 988 F.3d 239, 241 (5th Cir. 2021) (Oldham, J., concurring), because it does not meaningfully engage Congress' precise treatment of particular statutory terms (i.e., "weapons" versus "firearms").[34] "[T]he regulatory

---

[32] Def.'s Br. 12, ECF No. 25 (citing *Morehouse Enters. v. ATF*, No. 3:22-CV-116, 2022 WL 3597299 (D.N.D. Aug. 23, 2022) *appeal docketed*, *Arizona v. ATF*, No. 22-2812 (8th Cir.) and *Div. 80, LLC v. Garland*, No. 3:22-CV-148, 2022 WL 364854 (S.D. Tex. Aug. 23, 2022)).

[33] *Morehouse Enters. v. ATF*, No. 3:22-CV-116, 2022 WL 3597299, at *5–6 (D.N.D. Aug. 23, 2022) *appeal docketed*, *Arizona v. ATF*, No. 22-2812 (8th Cir.) (dedicating four paragraphs to interpretive arguments that the Court addressed at length in *Vanderstok*); *Div. 80, LLC v. Garland*, No. 3:22-CV-148, 2022 WL 364854, at *6 (S.D. Tex. Aug. 23, 2022) ("Because [plaintiff] failed to establish [irreparable harm], the court need not address its likelihood of success on the merits.").

[34] *See, e.g., Morehouse Enters.*, at *5–6 ("[T]he GCA itself defines 'firearm' as 'any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of

Case 7:23-cv-00033-WLS   Document 15-2   Filed 04/25/23   Page 16 of 20
Case 4:23-cv-00029-O   Document 27   Filed 03/19/23   Page 15 of 24   PageID 528

goals of the Gun Control Act were narrow[]: the Act ensured that '*weapons* [were] distributed through regular channels and in a traceable manner and [made] possible the prevention of sales to undesirable customers and the detection of the origin of particular *firearms*.'" *New York v. Burger*, 482 U.S. 691, 713 (1987) (emphases added) (alterations in original) (citing *United States v. Biswell*, 406 U.S. 311, 315–16 (1972)). When Congress sought to regulate *parts* of weapons, it did so meticulously.

Second, Defendants contend that the Court's reasoning in *Vanderstok* is inapplicable in this case because, there, "the Court concluded that the Rule's amended definition of 'frame or receiver' likely exceeded ATF's statutory authority because it would 'regulate a component as a "frame or receiver" even after ATF determines that the component in question is *not* a frame or receiver.'"[35] Defendants argue this case is different because, in its Open Letter and Polymer80 Letter, ATF *did* conclude that Polymer80's products are "frames" and therefore "firearms" for purposes of the GCA.[36] Indeed, "[n]owhere in either letter does ATF determine these products are not frames."[37] But the facts are not as straightforward as Defendants suggest. Importantly, ATF issued its December 2022 letters characterizing Polymer80's products as "firearms" in the midst of ongoing litigation over its Final Rule and entirely unprompted, not because Plaintiff had submitted a request for classification of its products. Even more importantly, ATF *had*, on multiple occasions in the preceding years, previously determined that Polymer80's receiver

---

an explosive[.]' 18 U.S.C. § 921(a)(3)(A). . . . Congress defined 'firearm' more broadly than simply a fully operational weapon, as the statute expressly includes items that 'may readily be converted to expel a projectile.'").
[35] Def.'s Br. 13, ECF No. 25 (emphasis in original) (quoting Opinion 10, *Vanderstok*, No. 4:22-CV-00691-O (N.D. Tex. Sept. 2, 2022)).
[36] *Id.*
[37] *Id.*

blanks are *not* firearms for purposes of the GCA.[38] In short, the Court sees no reason to depart from earlier reasoning with respect to the Final Rule.

### b. A weapon parts kit is not a firearm.

Plaintiff is also likely to succeed on its claim that the Final Rule unlawfully treats weapon parts kits as firearms. The Final Rule contains its own definition of "firearm," notwithstanding that the GCA already defines the term. Under the Final Rule, "[t]he term shall include a weapon parts kit that is designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11 (definition of "firearm"). That language conflicts with the statute's definition of "firearm."

Despite Defendants' arguments to the contrary, ATF has no general authority to regulate weapon parts.[39] But the Final Rule grants ATF that general authority by copying language used throughout the statutory definition. It takes phrases like "designed to" and "may readily be converted" and "assembled" from various places in the statute, cobbling them together to form ATF's own definition of "firearm." Those terms may add a patina of credibility to the drafting, but they tarnish Congress's carefully crafted definition. More importantly, they unlawfully expand ATF's authority beyond the boundaries set by the Act.

Under § 921(a)(3)(B), the only firearm parts that fall under ATF's purview are "the frame or receiver of any such weapon" that Congress defined as a firearm. 18 U.S.C. § 921(a)(3)(B). But the Final Rule regulates weapon parts kits that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11. The statute covers "any *weapon*" that is "designed to" or "may readily be converted to" fire a projectile. 18 U.S.C. § 921(a)(3)(A) (emphasis added). Congress's definition

---

[38] See note 2 *supra*.
[39] Def.'s Br. 15, ECF No. 25.

does not cover weapon *parts*, or aggregations of weapon parts, regardless of whether the parts may be readily assembled into something that may fire a projectile.[40]

The statutory context repeatedly confirms that Congress intentionally chose not to regulate "weapon" parts generally. As further evidence, look to § 921(a)(4)(C), which does allow for the regulation of "parts." But it allows for the regulation only of parts of "destructive devices"—one of the four statutory sub-definitions of "firearm." *Id.* § 921(a)(3)(D). The term "destructive device" is defined as "any explosive, incendiary, or poison gas," such as a bomb, grenade, mine, or similar device. *Id.* § 921(a)(4)(A). The definition of "destructive device" also includes "any type of weapon" that "may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter." *Id.* § 921(a)(4)(B). For example, suppose a manufacturer tried to sell a parts kit to make a homemade grenade. ATF could regulate that parts kit because it can regulate "any combination of parts either designed or intended for use in converting any device into" a grenade, from which a grenade "may be readily assembled." *Id.* § 921(a)(4)(C). Likewise for bombs, rockets, missiles, and other destructive devices. But commonly sold firearms such as 9mm pistols or .223 rifles do not fall under the specialized definition of "destructive devices," so weapon parts kits for those firearms cannot be properly regulated as components of "destructive devices." *Id.* § 921(a)(4).

In sum, the Gun Control Act's precise wording demands precise application. Congress *could have* described a firearm as "any combination of parts" that would produce a weapon that could fire a projectile. It used that language elsewhere in the definition. *Id.* § 921(a)(4)(C). Congress could have described a firearm as any part "designed" to be part of a weapon. It used

---

[40] Def.'s Br. 14–15, ECF No. 25.

that language too. *Id.* § 921(a)(3)(A), (a)(4)(C). Congress could have described a firearm as a set of parts that "may be readily assembled" into a weapon, as it did for "destructive device." *Id.* § 921(a)(4)(C). Congress could have written all those things, and the very definition of "firearm" demonstrates that Congress knew the words that would accomplish those ends.[41] But Congress did not regulate firearm parts as such, let alone parts kits that are "designed to or may readily be completed, assembled, restored, or otherwise converted to expel a projectile by the action of an explosive." 27 C.F.R. § 478.11.

\*   \*   \*   \*

For the reasons discussed, the Court stands by its earlier reasoning and finds that Plaintiff has demonstrated a strong likelihood of success on the merits of its claims that the Final Rule—specifically, 27 C.F.R. §§ 478.11, 478.12(c)—exceeds the scope of ATF's authority under the Gun Control Act. Because it has satisfied this element with its APA claim, the Court need not address the merits of its remaining claims.

## 2. Substantial Threat of Irreparable Harm

In the Fifth Circuit, a harm is considered "irreparable only 'if it cannot be undone through monetary remedies.'" *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir.1984)). A showing of

---

[41] Congress's definition of "machine gun" elsewhere in the U.S. Code is a great example of a definition would fit the kind of rule ATF has in mind:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part* designed and intended solely and exclusively, or *combination of parts* designed and intended, for use in converting a weapon into a machinegun, *and any combination of parts from which a machinegun can be assembled* if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphases added); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 448 (2006) ("Our more natural reading is confirmed by the use of the word 'contract' elsewhere in the United States Code . . . .").

18

economic loss is usually insufficient to establish irreparable harm because damages may be recoverable at the conclusion of litigation. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). However, "an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989). And where costs are not recoverable because the government-defendant enjoys sovereign immunity from monetary damages, as is the case here, irreparable harm is generally satisfied. *See Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

Plaintiff alleges that it continues to suffer irreparable harm in the form of unrecoverable compliance costs and—within days of this Order—is threatened with having to dissolve its business if its economic losses continue unabated.[42] Defendants contest Plaintiff's alleged injury on grounds that it purportedly waited eleven months to seek an injunction and that any harm Polymer80 is suffering is purely "self-inflicted."[43] The Court disagrees.

Because Defendants in this case are entitled to sovereign immunity, and therefore not liable for damages, Plaintiff's economic injuries cannot be recovered. Moreover, Plaintiff alleges that its business enterprise faces certain dissolution if the Court does not provide immediate relief from compliance with the Final Rule. In this way also, Polymer80's harm "threaten[s] the existence of [its] business," and is therefore irreparable for purposes of injunctive relief. *Atwood*, 875 F.2d at 1179. Notably, Defendants do not contest the assertion that the company's dissolution will likely result.[44]

Importantly, irreparable harm need not be financial in nature. Even "alleged" deprivations of constitutional or procedural rights may justify injunctive relief. *See, e.g., Opulent*

---

[42] Pl.'s Br. 21–22, ECF No. 15.
[43] Def.'s Br. 22–24, ECF No. 25.
[44] *See* Def.'s Br. 23–24, ECF No. 25.